PEOPLE ex rel. EDWARD F. BRUSH, Relator, *v.* CHARLES SCHUM and FREDERICK BEHRMAN, Respondents.

PEOPLE ex rel. EDWARD F. BRUSH, Relator, *v.* WALTER GULLIVER and DAVID G. McKELVEY, Respondents.

PEOPLE ex rel. EDWARD F. BRUSH, Relator, *v.* MICHAEL J. WADE and WILLIAM W. HERN, Respondents.

PEOPLE ex rel. EDWARD F. BRUSH, Relator, *v.* FRANK H. WELLS and OSCAR STRYKER, Respondents.

(Supreme Court, Westchester Special Term, December, 1917.)

Election Law, as amended by Laws of 1917, chapter 815 — voting by soldiers and sailors — who are sole judges of qualifications of voters — elections.

Under chapter 815 of the Laws of 1917, amending the Election Law in relation to voting by soldiers and sailors and the canvass of war ballots, the inspectors of election are the sole judges of the qualifications of a voter, and, where a challenge is made before an envelope is opened and the inspectors overrule the challenge and open the ballot, their decision that the voter is qualified to vote in that election district is final.

Supreme Court, December, 1917.    [Vol. 102.

APPLICATION for writ of mandamus.

George H. Taylor, Jr., Jeremiah D. Toomey and J. Henry Esser, for relator.

Frank A. Bennett and Arthur M. Johnson, for Edwin W. Fiske.

TOMPKINS, J.   The four ballots involved in this proceeding were all cast for Edwin W. Fiske for mayor of the city of Mt. Vernon, and were duly protested on behalf of the relator Edward F. Brush, also a candidate for mayor of that city.   They were all soldiers' votes, and were received by the inspectors of election of the said four districts along with the other soldiers' votes, each in a sealed envelope.

The Arthur Niemeyer ballot which is involved in the first above-named proceeding was challenged before the inspectors opened the envelope containing said ballot on the ground that said Niemeyer was not a resident of that election district, which was the sixth district of the fourth ward.   It must be assumed from the fact that after the challenge was made the inspectors opened the envelope and deposited the ballot in the ballot box and thereafter canvassed the same, that said inspectors determined that Niemeyer was a qualified voter of that election district, and the facts developed upon this judicial investigation do not show to the contrary.

The facts are that the voter's father resides and has for many years resided in this election district, and that when the young man was about nineteen years of age he left his father's house because of some disagreement with him, and boarded in the same city for about six months, whereupon he enlisted in Company H of the Tenth regiment, and served for a time as

aqueduct guard, and thereafter in the federal service at Camp Whitman, on the Mexican border, and for about eight months past has been in the federal service at Watervliet, N. Y., and later has been at Spartanburg, where he is now stationed. He became of age in July, 1917, so that he has never before voted anywhere. When he left his father's home, he left some of his clothing and other personal effects there, and during his service in the army has visited his father. I think, under all these circumstances, that he might well claim his father's home as his residence for voting purposes, and that the election inspectors were justified in receiving and counting his vote. The relator's application with respect to this ballot will be denied.

With respect to the Harold W. Hagenbuckle ballot in the first district of the second ward, the facts are much the same. He, too, left his father's home when he was about nineteen years of age, and lived for about two years in different places in the state of Texas, and about three years ago went to the state of Montana, where he worked a homestead claim, which was staked out before he went upon it, and it does not appear that the claim belonged to him. He registered under the selective draft in Montana, and on his own application was transferred to the city of Mt. Vernon. After spending a few weeks at his father's home in that city, he was sent from there into the military service. Prior to that time, he made two or three visits to his father's home. Upon the official envelope containing his vote, he swore that he was a qualified elector of the city of Mt. Vernon, residing at 99 Vista place, which was his father's home. There is no claim that he ever voted in any other place, and I think under these circumstances the district inspectors were

10

justified in deciding that his residence was at that place, and that he was a qualified elector of that election district.

The next ballot is that of Oscar LeRoy Ferris, in the fifth district of the second ward. The only objection to this ballot is that it does not unequivocally appear upon the face of the official envelope that the voter was twenty-one years of age on election day. The printed part of the affidavit upon the official envelope which was signed and sworn to by the elector reads as follows: " I do swear (or affirm) that I have been a citizen of the United States for ninety days and am now of the age of at least twenty-one years or will be on the ———— day of ———— 19—." The voter filled in the blank spaces in the above quoted part of the affidavit so that it read, " or will be on the 5th day of December, 1917." This was concededly a mistake on the part of the voter because, as a matter of fact, he is thirty years of age, his father having testified at this investigation that he was born on December 5, 1887, and inadvertently and incorrectly he stated in the affidavit on the envelope that he would be twenty-one years of age on the 5th day of December, 1917.

This vote was challenged before the envelope was opened because it appeared on the face of the envelope that the man who had signed and sworn to the affidavit was not old enough to vote on election day, and that protest was based upon the erroneous statement made by the voter himself in said affidavit; and if the inspectors of election had not been acquainted with the voter, or had not known that he was a duly qualified voter of the district, it would have been their duty under section 513 of the Election Law to have destroyed the ballot without unfolding or inspecting it; but that was not done. On the contrary, the challenge was over-

ruled, and the envelope was opened, and the ballot was canvassed and the vote counted.  The relator claims that the challenge was not specifically determined, but from the fact that the envelope was opened, and the ballot canvassed, and the vote counted, it must be inferred that the inspectors did overrule the challenge; and that is borne out by the fact that they indorsed the challenge upon the envelope and upon the ballot as well, and thereupon canvassed the ballot.

From all these circumstances, I think it must be assumed that the inspectors, either by reason of their personal acquaintance with the voter or from some information received by them, were satisfied that he was more than twenty-one years of age, and a duly qualified elector of the district.  The undisputed fact is that he was nearly thirty years of age, a resident of the district, and qualified to vote at said election, and in these circumstances it seems to me that the challenge was rightly overruled, and the vote properly given to Mr. Fiske.

I am convinced that the purpose of the legislature was that effect should be given to the intent of the soldiers and sailors who are entitled to vote, and that every reasonable facility should be provided for the casting and canvassing of their votes without the strict application of all the formalities provided by the Election Law.  This view is supported by that provision of the amendment of 1917 which declares " that no ballot shall be rejected as void where the intent of the voter is clearly apparent," and by that other provision of section 512 which reads " No mere informality in the manner of carrying out or executing the provisions of this article shall invalidate the election held under the same  or authorize the rejection of the returns thereof; and the provisions of this article

shall be liberally construed for the purposes herein expressed or intended;'' and that further provision of section 510 which reads: '' If, for any cause, the official ballots, poll books and envelopes shall not be provided as required by law at any polling place, upon the opening of the polls for any election thereat, or if the supply of official ballots or envelopes shall be exhausted before the polls are closed, unofficial ballots, poll books and envelopes printed or written, made as nearly as practicable in the form of the official ballot, poll books and envelopes may be used.''

This last quoted provision of the law has a special application to the fourth and last of these four ballots in question, namely, the Captain John Roache ballot of the fourth district of the second ward. This ballot was protested because it was contained in an unofficial envelope which had not upon or attached to it the oath provided by section 510 of the Election Law, as amended by Laws of 1917, chapter 815. The ballot itself was in the form of a printed paster attached to a sheet of plain white paper, and was inclosed in a plain large white envelope upon which the voter had written, '' John J. Roache, 259 South Ninth Avenue, Mt. Vernon, N. Y.,'' which was within the fourth election district of the second ward. In that form the sealed envelope containing the ballot was received by the inspectors of this election district along with the other soldiers' votes, and the envelope when received bore upon it the seal of office of the secretary of state of the state of New York, which seal had been affixed pursuant to section 513 of the Election Law, and the envelope bearing his seal had· then been transmitted with all the envelopes containing ballots of the soldier voters of the county of Westchester to the board of elections of that county.

It is conceded, at least it is not disputed, that this

envelope prepared by Captain Roache and containing his ballot followed the same course and was treated in all respects the same as the other envelopes containing soldiers' votes for Westchester county, and while this envelope did not have upon or attached to it the oath of the voter required by section 510, I think that when the inspectors received it along with the other envelopes, and found upon it the seal of the secretary of state, they had a right to assume that the envelope and the ballot contained therein had been prepared by a soldier who was entitled to vote, but who had not been provided with an official ballot and envelope as required by law, and that the case came within that provision of section 510 which provides, " If, for any cause, the official ballots, poll books and envelopes shall not be provided as required by law at any polling place, upon the opening of the polls for any election thereat, or if the supply of official ballots or envelopes shall be exhausted before the polls are closed, unofficial ballots, poll books and envelopes printed or written, made as nearly as practicable in the form of the official ballot, poll books and envelopes may be used;" and I think this provision of the law, when liberally construed, is comprehensive enough to justify such action by the board of inspectors; and, in the absence of any proof to the contrary, I think we should assume that the inspectors knew that the soldier whose name was written upon the envelope was a duly qualified voter of the district. At all events, it appears now that Captain Roache was entitled to vote in that election district, and that the ballot and the envelope were prepared by him in the form in which they were received, because he and the members of his command to the number of fifty who were absent from their election districts, in the actual military service of the

state, had not been provided with the official ballots and envelopes as required by law, and that said ballot and envelope were prepared by him as an unofficial ballot and envelope, written and prepared as nearly as practicable in the form of the official ballot and envelope.

The undisputed facts are that Captain Roache was the commanding officer of a separate company of fifty-four men, in which there were twenty-seven voters. The official ballots and other election paraphernalia did not reach his command; thereupon he communicated by telephone with the office of the secretary of state, and was told that if the official ballots did not arrive that they could prepare their own ballots, inclose them in plain envelopes, write thereon their names and addresses, and send them in a sealed package to the secretary of state. This was done. The envelope was received by the secretary of state and stamped by him as already stated, and from his office they were sent out in the regular way to the election officers of the county. It seems to me, under all these circumstances, that the challenge was properly overruled, and the ballot rightly deposited in the ballot box and canvassed. It was for just such a case that the provision of section 510 above quoted was enacted, and the words in that provision " as nearly as practicable " mean that a voter in the military service who has not been provided with the official ballots and envelopes shall do the best that he can with the means at hand for the casting and recording of his vote; and as appears now Captain Roache was a qualified voter of the district, and conformed in all things to the directions given him by the secretary of state, and in the absence of official ballots and envelopes substantially complied with the provision of the statute

for such an emergency.  This, therefore, disposes of the fourth and last of these disputed ballots, and requires a denial of the relator's application.

With respect of all of these ballots, and in support of these rulings, it may be further said that the soldiers and sailors election law makes the inspectors of election the sole judges of the qualifications of a voter, and in my opinion when a challenge is made before an envelope is opened, and the inspectors overrule the challenge and open the ballot, the decision is final. It must be so, because the statute provides that if upon investigation made before the deposit of the ballot in the ballot box it shall be determined that such a voter is not a qualified voter in said election district, his said ballot or ballots shall be destroyed, without unfolding or inspecting the same; so that in such a case the decision of the inspectors is final, because an error in the destruction of a ballot, if one should be made, could not be corrected, the ballot having been destroyed, and so it seems to me to follow logically that a decision by the inspectors that a voter is qualified to vote in the district must also be final.

Applications denied, without costs.